NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241546-U

NOS. 4-24-1546, 4-24-1547 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 7, 2025
Carla Bender
4ᵗʰ District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* H.C. and T.C., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Carroll County |
| Petitioner-Appellee, | ) | Nos. 21JA3 |
| v. | ) | 21JA4 |
| Jodi C., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | John J. Kane, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Knecht and Cavanagh concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The appellate court affirmed, finding the trial court's termination of respondent
mother's parental rights was not against the manifest weight of the evidence.

¶ 2     In August 2023, the State filed petitions to terminate the parental rights of

respondent mother, Jodi C., to her minor twin children, H.C. and T.C. (born in October 2016).

Following hearings on the State's petitions, the trial court found Jodi to be an unfit parent under

section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)) and determined it was in the

minors' best interests to terminate her parental rights. We affirm.

¶ 3                                I. BACKGROUND

¶ 4                              A. Initial Proceedings

¶ 5 On August 24, 2021, the State filed petitions for adjudication of wardship, alleging H.C. and T.C. were neglected minors whose environment was injurious to their welfare under section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2020)). The allegations regarding each child were the same. The State alleged Jodi, a registered sexual predator, moved with the children to the residence of Brenda G., who also resided with her two minor children. According to the petitions, Jodi told Brenda she was 17 years old. The State alleged that, at some point, Brenda observed Jodi kissing Brenda's 15-year-old daughter, A.H., and engaging in a romantic relationship with her. A.H. admitted she was in a sexual relationship with Jodi. A.H. was also observed "screaming and yelling" at H.C. and T.C. Police eventually arrested Jodi for failing to register as a sex offender and for knowingly communicating with a minor over the Internet. The trial court thereafter entered a temporary custody order and found there was an immediate and urgent need to remove H.C. and T.C. from the home and placed them in the temporary custody of the Illinois Department of Children and Family Services (DCFS).

¶ 6 On January 26, 2022, Jodi admitted to the allegations of the petition and the facts contained therein. Jodi also admitted she was 24 years old at the time she represented herself to be 17 and that she kissed A.H. and posted the content on a social media platform. The trial court subsequently entered an adjudicatory order finding H.C. and T.C. neglected.

¶ 7 At the dispositional hearing on February 25, 2022, the DCFS dispositional report and report from the DCFS contract agency, Believe in the Children (BIC), were admitted as evidence without objection. No further evidence was presented. The reports indicated Jodi continued to make "bad life choices" despite "some improvement in her parenting skills." This included continued contact with A.H. and A.H.'s family through social media. DCFS reported

Jodi completed her parenting sessions and was working on the next phase of parenting coaching. Although Jodi started off well, she had "since regressed in her parenting and end[ed] visits early." DCFS found Jodi had been seeing H.C. and T.C. other than when supervised, as had been ordered, and was untruthful about it when questioned. At the time of the dispositional hearing, DCFS could not "recommend that [Jodi's] children be return[ed] to her care since she [was] lacking the resources, understanding, ability, and drive to care for her children." Jodi also had not "taken responsibility for her actions that caused the children to come into care and doesn't understand why they are in care."

¶ 8        BIC reported Jodi regressed in both parenting class performance and visitation. BIC noted, "Engagement with the children became increasingly tense and strained[,] with [Jodi] expressing more frustrations and not utilizing the skills she claimed to have grasped." Visits with T.C. and H.C. were for one hour once a week, and at each visit, Jodi "lost patience and began getting [the children] ready to leave earlier and earlier." Jodi also behaved inappropriately at times and refused to follow protocol. The children appeared "nervous, show[ing] physical signs of stress and distress." Jodi "insist[ed] on playing the games she want[ed] to play in spite of requests from the children." She routinely insulted and belittled T.C. and rarely engaged with H.C. BIC noted, "[W]hile [Jodi] showed up for class, she retained little and implemented none of the skills and training from classes."

¶ 9        The trial court then entered a dispositional order, finding Jodi unfit or unable, for reasons other than financial circumstances alone, to care for, protect, train, or discipline the minors. The court adjudicated H.C. and T.C. neglected, made them wards of the court, and placed custody and guardianship with DCFS.

¶ 10        The trial court held a permanency review hearing on August 5, 2022. Again, the

reports submitted by DCFS and BIC were admitted without objection. Jodi had to be repeatedly reminded to come prepared for her parenting classes. The parenting curriculum and study material began at a high school level "due to [Jodi's] claims of working on her GED testing," but BIC adjusted the program "to a 7th/8th grade level to better assist Jodi in learning the skills." In another attempt to assist Jodi in understanding the concepts of the program, BIC readjusted the curriculum to "an elementary level." The impact of Jodi's visits with the minors was "visibly evident." The children became nervous, showed "physical signs of stress and distress," and "inappropriately vie[d] for the attention of their caregivers and strangers." Both children "wet their pants for days after the visits." During visits, Jodi loudly discussed T.C.'s "[b]oobies" and how she wanted to buy T.C. a bra, even though T.C. was five years old. H.C. "lower[ed] himself to [Jodi's] expectations" and "revert[ed] to baby talk and pointing." H.C. also licked his lips until they chapped while visiting with Jodi.

¶ 11                    B. Termination Proceedings

¶ 12          In August 2023, the State filed petitions to terminate Jodi's parental rights to H.C. and T.C. In relevant part, the petitions alleged Jodi was an unfit parent within the meaning of section 1(D) of the Adoption Act because she (1) failed to protect her children from conditions within their environment injurious to their welfare (750 ILCS 50/1(D)(g) (West 2022)), (2) failed to make reasonable efforts to correct the conditions that brought the minors into care (750 ILCS 50/1(D)(m)(i) (West 2022)), and (3) failed to make reasonable progress toward the return of the minors within the following nine month period: February 25, 2022, to November 25, 2022 (750 ILCS 50/1(D)(m)(ii) (West 2022)).

¶ 13                    1. *Unfitness Hearing*

¶ 14                        a. Jaclyn Rogers

- 4 -

¶ 15 Jaclyn Rogers, a placement supervisor for DCFS, testified she oversaw and approved the recommended service plans after caseworkers completed them. Rogers testified that during the relevant nine-month period, Jodi held a job at Casey's for a "few months." She was then employed at Snak-King for a short time after that. On the issue of parenting, Jaclyn testified Jodi was to demonstrate "safe and protective parenting skills that she had learned in her classes." But even though Jodi engaged in individualized sessions and classes more specifically tailored to her needs, there were concerns over Jodi's ability to retain and demonstrate that information during visits or in class.

¶ 16 b. Grace Arneson

¶ 17 Grace Arneson, a DCFS caseworker, went over Jodi's service goals related to living independently, employment, mental health, and parenting. Although Jodi engaged with counseling services, she failed to address the issues "pertaining to the children coming into care or her own trauma." Jodi also failed to obtain independent housing, and as far as Arneson knew, Jodi "was never employed by anyone." Further, Arneson testified Jodi "never was able to demonstrate what she learned in the parenting classes with her children." Jodi often pushed "her own agenda" during visits, and she failed to "demonstrate that she could follow [the children's] lead *** and become interested in things they were interested in."

¶ 18 c. Patti Jennings

¶ 19 Patti Jennings testified she was a founder, board member, and former director of BIC. She testified Jodi regularly "showed up" and engaged in her parenting courses, despite her difficulty concentrating and retaining information. When it came to budgeting, Jennings explained she "developed a program that was at about a third-grade level for basic math," and she gave Jodi assignments to complete, but Jodi rarely completed her homework tasks. On at

least one occasion, Jodi indicated she would have her father complete her take-home assignments because she thought it was "stupid" that she had to do them.

¶ 20      Jennings testified Jodi constantly lied to her, which required her to verify everything Jodi told her. When determining whether Jodi "was still communicating with [A.H.]," with whom Jodi was to have no contact, Jennings discovered A.H. "was still on [Jodi's] phone plan, and [Jodi] was calling her." According to Jennings, Jodi "did not think she had to abide by [the] rules" of her sex-offender probation and believed she "could be alone with kids" and "go where she wanted to," even after Jennings went over Jodi's probation conditions with her in writing. One day later, Jodi was arrested at a park with the children.

¶ 21      Jennings also observed Jodi's visits with T.C. and H.C. Instead of effectively parenting the children, Jodi "played with [them] like a child," and "the children responded to her like another child." Jodi also "favored one child over the other." When Jennings talked to Jodi "about the impact of actions and her history on the children, she just denied it." And even though it was "proven and discussed" that Jodi exposed the children to "sexualized behaviors" while she was in a relationship with A.H., Jodi denied it.

¶ 22      Additionally, T.C. and H.C. were "very uncomfortable and verbalized their uncomfortableness with being physically engaged with [Jodi]," and Jennings had to tell Jodi to stop inappropriately touching the children during visits multiple times. Jennings also prohibited Jodi from bringing clothes for the children after she kept her hands in H.C.'s pants for "longer than [anyone was] comfortable with" while H.C. changed. Jennings further testified Jodi insisted on having photographs taken during visits. In one photograph, Jodi posed with her hands on the children, one hand "on one crotch and one on the other." Eventually, Jodi's visits with the children were stopped because "they were so traumatic for the children" and "were causing them

all kinds of problems and emotional disturbances."

¶ 23                                    d. Colette Binger

¶ 24         Colette Binger testified she was a licensed clinical professional counselor who "was asked to counsel the children through a DCFS contract through [BIC]." During one session with the children, T.C. disclosed "that she had been in the bathroom with Jodi when she was showering with an adolescent girl who [Jodi] had explained *** was her girlfriend." T.C. "was very uncomfortable because they were in the shower together, and she got in the shower with them." Binger also observed several of Jodi's visits with the children, and she noticed Jodi often played and interacted with T.C. differently than with H.C. There were also "multiple instances" where Binger "had to make sure that Jodi wouldn't go in the bathroom with the children." And even though Jodi was informed of the rules against taking photos of the children, "she would sneak pictures in during visits."

¶ 25         Binger testified the children's visits with Jodi induced "panic-attack-like symptoms" to the point the children began to have nightmares "about two to three days *** before a visit." T.C. and H.C. "would also, after a visit, wet the bed, wet their pants, have horrible stomachaches, headaches. They would think that a car was following them that had a family member in it ***. They would be at McDonald's and think that they saw [Jodi]." According to Binger, both children explained to her in "vivid detail" that the visits caused their extreme emotional distress. Binger testified that since visitation stopped, the children were more social, calmer, and their "paranoia in watching cars" had diminished.

¶ 26                                    e. Jodi

¶ 27         Jodi testified on her own behalf. As of the time of the unfitness hearing, Jodi had not obtained independent housing, and she lived with her grandmother. She believed she would

have enough money to cover rent and expenses for a one-bedroom apartment if she "manage[d] [her] money right," but she admitted she had never lived independently. Jodi testified she had applied for three jobs within the last year, without success. Although currently unemployed, Jodi received Social Security disability benefits. Jodi's learning disability caused her to struggle to understand verbal information, and Jodi stated she also suffered from dyslexia. In Jodi's opinion, she "did everything in [her] power to understand everything" in her parenting courses, which included one-on-one sessions with Jennings. Yet Jodi learned only "half of it." She claimed no one attempted to adjust her services to accommodate her disabilities.

¶ 28    Further, Jodi acknowledged she was a registered sex offender. At the time she was arrested for being in a public park, she understood she was not allowed to be within 500 feet of a park or school without permission. Jodi denied sexually abusing H.C. and T.C. She also denied touching them inappropriately during visits. Rather, Jodi testified Binger told her the visits with the minors were "really good." According to Jodi, H.C. and T.C. were excited to see her at every visit. When the children arrived, they "jump[ed] out of the vehicle" and ran up to see her. When it was time to leave, T.C. would cry because she did not want Jodi to go. Still, Jodi acknowledged visitation stopped due to the children experiencing trauma and nightmares. And while Jodi acknowledged being told not to bring clothing for the children, she claimed no one gave her a reason why.

¶ 29    Ultimately, the trial court found Jodi failed to make reasonable progress toward the return of T.C. and H.C. to her care during the relevant nine-month period. In making its unfitness determination, the court observed Jodi never "obtained and maintained independent housing." She also failed to be steadily employed. The court further pointed out "that, although Jodi attended parenting classes, she couldn't retain what she was taught[,] and she could not

implement what she was taught during visits with the children." In doing so, the court noted the individual counseling sessions and other attempts to improve Jodi's retention and implementation of the parenting material during visits. Thus, the court found "Jodi's parenting skills did not improve at all during her time with [BIC]" and she "did not make reasonable progress in her ability to apply what she was taught to parenting during visits."

¶ 30                                    2. *Best Interests Hearing*

¶ 31        The matter then proceeded to the best interests hearing. The best interests reports indicated T.C. and H.C. had been placed with their current foster mother since October 2022. The foster mother's home was "clean, safe, [and] well-cared for." The minors each had their own bedroom and age-appropriate toys. The children's foster mother provided them with "nutritious and ample food along with parental guidance and love." She ensured the minors' medical, mental, and emotional needs were met. The children appeared bonded with their foster mother and turned to her in times of fear or discomfort. They "consistently expressed a desire to be adopted by her." Since their placement in the home, the minors attended school regularly and were performing well academically. The minors had "several friends at school and look[ed] forward to attending each day." They also participated in "several community activities such as clubs at the library and sports through the park district."

¶ 32        At the best interests hearing, Arneson testified the minors' foster mother "care[d] greatly for their needs as well as their interests, their likes and dislikes, and things that they would find enjoyable." T.C. and H.C. appeared well cared for and were thriving in their current placement. When Arneson spoke with the children, they told her they felt "safe and loved" and were "very happy" in their placement. The children referred to their foster mother as "mom"; they did not speak to or ask about Jodi. According to Arneson, the foster mother expressed her

- 9 -

desire to adopt T.C. and H.C.

¶ 33 Ultimately, the trial court found it was in the best interests of T.C. and H.C. to terminate Jodi's parental rights.

¶ 34 This appeal followed.

¶ 35 II. ANALYSIS

¶ 36 On appeal, Jodi contends the trial court's unfitness and best interests findings were against the manifest weight of the evidence.

¶ 37 A. Unfitness Finding

¶ 38 " 'The State must prove parental unfitness by clear and convincing evidence.' " *In re A.L.*, 409 Ill. App. 3d 492, 500 (2011) (quoting *In re Jordan V.*, 347 Ill. App. 3d 1057, 1067 (2004)). A determination of parental unfitness involves factual findings and credibility determinations which the trial court is in the best position to make because its "opportunity to view and evaluate the parties *** is superior." (Internal quotation marks omitted.) *In re M.I.*, 2016 IL 120232, ¶ 21. "A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 48. "A trial court's decision is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." (Internal quotation marks omitted.) *In re N.B.*, 2019 IL App (2d) 180797, ¶ 30.

¶ 39 The Adoption Act provides several grounds on which a trial court may find a parent unfit. "[S]ufficient evidence of one statutory ground *** [is] enough to support a [court's] finding that someone [is] an unfit person." (Internal quotation marks omitted.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 83. In the present case, the trial court found Jodi was an unfit parent as defined in section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2022)).

Section 1(D)(m)(ii) provides, in part, a parent will be considered an "unfit person" if he or she fails "to make reasonable progress toward the return of the child to the parent during any [nine]-month period following the adjudication of neglected *** or dependent minor." 750 ILCS 50/1(D)(m)(ii) (West 2022). Reasonable progress exists when the evidence shows "the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991). A parent does not demonstrate reasonable progress toward the goal of reunification with her children if she does not implement the skills taught to her through her services. See *In re R.L.*, 352 Ill. App. 3d 985, 999 (2004).

¶ 40    Here, the evidence established Jodi failed to implement the skills taught to her through her services. Despite being briefly employed at Casey's and Snak-King, Jodi never obtained steady employment, and she only applied for three jobs in the last year. She also failed to obtain suitable independent housing. Despite engaging with counseling services, Jodi failed to address the issues "pertaining to the children coming into care or her own trauma." Moreover, Jodi acknowledged she was a registered sex offender and understood she was not to be within 500 feet of a park or school without permission. Yet Jodi was arrested at a park with her children present one day after Jennings went over the conditions of her probation with her in writing. According to Jennings, Jodi "did not think she had to abide by [the] rules" and thought she "could be alone with kids" and "go where she wanted to." In fact, Jennings discovered A.H., the adolescent girl with whom Jodi had been in a relationship, "was still on [Jodi's] phone plan, and [Jodi] was calling her," despite Jodi being ordered not to communicate with her.

¶ 41    Further, the record supports the trial court's determination Jodi failed to "make

reasonable progress in her ability to apply what she was taught to parenting during visits." As the court observed, despite the one-on-one sessions and other attempts to improve Jodi's retention and implementation of the parenting material, including an individualized curriculum that was at about a third-grade level, Jodi failed to retain and demonstrate that information during visits or in class. When Jodi visited the children, she played with them "like a child." Jodi also "favored one child over the other," and Binger noticed Jodi often played and interacted with T.C. differently than with H.C. Jodi denied exposing the children to "sexualized behaviors," but T.C. disclosed to Binger that she had been in the bathroom with Jodi when she was showering with A.H. T.C. then got into the shower with them. Jennings also saw a photograph of Jodi with her hands on the children, one hand "on one crotch and one on the other." And even though Jodi knew she was not to take photos of the children, she kept sneaking pictures in during visits.

¶ 42        Moreover, the children "verbalized their uncomfortableness with being physically engaged with [Jodi]." During visits, Jodi had to be told to stop touching the children inappropriately multiple times, and Binger prevented Jodi from going into the bathroom with them on numerous occasions. Jennings also prohibited Jodi from bringing clothes for the children after Jodi kept her hands in H.C.'s pants for "longer than [anyone was] comfortable with." Eventually, Jodi's visits with the children stopped because they induced "panic-attack-like symptoms" to the point the children began to have nightmares "about two to three days ***  before a visit." After visits, the children would "wet the bed, wet their pants, have horrible stomachaches, headaches. They would think that a car was following them that had a family member in it ***. They would be at McDonald's and think that they saw [Jodi]." In fact, both children explained to Binger in "vivid detail" that the visits were causing their extreme emotional distress.

¶ 43        So, since the evidence confirms Jodi failed to make reasonable progress during the relevant nine-month period, we cannot say the trial court's unfitness finding stands against the manifest weight of the evidence because the opposite finding (*i.e.*, fitness) is not readily apparent. See *N.B.*, 2019 IL App (2d) 180797, ¶ 30.

¶ 44                              B. Best Interests Finding

¶ 45        After a parent is found unfit, "the focus shifts to the child." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The issue ceases to be "whether parental rights can be terminated" and becomes "whether, in light of the child's needs, parental rights should be terminated." (Emphases omitted.) *D.T.*, 212 Ill. 2d at 364. The trial court must consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2022)). See *In re T.A.*, 359 Ill. App. 3d 953, 959-60 (2005). Those factors include: the child's physical safety and welfare; the development of the child's identity; the child's familial, cultural, and religious background and ties; the child's sense of attachments, including where the child feels loved, attached, and valued; the child's sense of security, familiarity, and continuity of affection; the child's wishes and long-term goals; the child's community ties; the child's need for permanence; and the uniqueness of every family and each child. 705 ILCS 405/1-3(4.05) (West 2022). We will not overturn a court's best interests finding unless it is against the manifest weight of the evidence. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009).

¶ 46        Here, the evidence shows the best interests factors support the termination of Jodi's parental rights. The children's foster mother was committed to adoption, and both children "consistently expressed a desire to be adopted by her." T.C. and H.C. were bonded with their foster mother and referred to her as "mom." By the time of the best interests hearing, the children did not interact with or ask about Jodi. Further, the foster home was clean, safe, and stable.

Arneson testified the minors' foster mother "care[d] greatly for their needs as well as their interests, their likes and dislikes, and things that they would find enjoyable." The minors each had their own bedroom and age-appropriate toys. The children's foster mother provided them with "nutritious and ample food along with parental guidance and love." She ensured the minors' medical, mental, and emotional needs were met. Since their placement in the home, the minors attended school regularly and were performing well academically. The minors had "several friends at school and look[ed] forward to attending each day." They also participated in "several community activities such as clubs at the library and sports through the park district." When weighed against a legitimate concern for permanency for children of tender years, the trial court's finding termination was in the minors' best interests is not against the manifest weight of the evidence. See *T.A.*, 359 Ill. App. 3d at 960.

¶ 47 All told, the record shows T.C. and H.C. feel loved, valued, secure, and nurtured in their current placement and have structure and continuity, and it supports the trial court's decision. Thus, we cannot say the court erred in finding it was in the children's best interests to terminate Jodi's parental rights.

¶ 48 III. CONCLUSION

¶ 49 For the reasons stated, we affirm the trial court's judgment.

¶ 50 Affirmed.